UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GEORGE RUFFIN,

               Petitioner,

v.                                          Case Number 07-15283
                                          Honorable Thomas L. Ludington
THOMAS K. BELL,

               Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS,
GRANTING IN PART A CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO APPEAL _IN FORMA PAUPERIS_**

      Petitioner George Ruffin, presently confined at Carson City Correctional Facility in Carson

City, Michigan, has filed a _pro se_ application for the writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. Petitioner was convicted in Wayne County Circuit Court of second-degree murder, felon

in possession of a firearm, and possession of a firearm during the commission of a felony (felony

firearm). He was sentenced to two years in prison for the felony firearm conviction, followed by

concurrent terms of twenty-two to fifty years for the murder conviction and forty to sixty months

for the felon-in-possession conviction. Petitioner alleges that he is incarcerated in violation of his

rights under the Sixth and Fourteenth Amendments to the United States Constitution. Respondent

Thomas K. Bell asserts in an answer to the petition filed through counsel that Petitioner's claims are

procedurally defaulted. Procedural default is not a jurisdictional limitation, and Petitioner's claims

lack merit. Accordingly, the Court will deny the petition on the merits.

I.

      Petitioner was charged with the fatal shooting of Cornelius Gaylord Smith in Petitioner's

Detroit home on November 5, 2001.  Mr. Smith died from a single gunshot wound to the chest.  On April 29, 2002, a Wayne County Circuit Court jury found Petitioner guilty of murder in the second degree, Mich. Comp. Laws § 750.317, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b.  The trial court sentenced Petitioner as a habitual offender to two years in prison for the felony firearm conviction, followed by concurrent terms of twenty-two to fifty years for the murder conviction and forty to sixty months (three years, four months to five years) for the felon-in-possession conviction.

## A.

Petitioner raised three claims through counsel in an appeal of right:  (1) the trial court prematurely terminated jury selection and made an erroneous ruling on defense counsel's peremptory challenges; (2) the trial court violated his right to a fair trial and his right to present a defense by denying (a) his request for appointment of an expert witness and (b) his motion to adjourn the trial; and (3) there was insufficient evidence to support the murder conviction.  In a *pro se* supplemental brief, Petitioner argued that:  (1) the trial court erred (a) by not issuing a cautionary jury instruction after an outburst by the victim's brother and (b) by instructing the jurors to consider any hostility of the witnesses; and (2) trial counsel was ineffective for leading Petitioner to believe he could give testimony in support of a voluntary manslaughter defense.  The Michigan Court of Appeals affirmed Petitioner's convictions in part, and remanded his case to the trial court for an evidentiary hearing on Petitioner's *Batson* claim.[1]  *See People v. Ruffin*, No. 243414, 2004 WL 435417, at *4, *6 (Mich. Ct. App. Mar. 9, 2004).

---

[1] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

-2-

On April 2, 2004, the trial court held a reconstruction hearing and determined that defense counsel had made improper use of peremptory challenges to achieve a racially balanced jury. The Court of Appeals subsequently affirmed Petitioner's convictions after concluding that the trial court had properly denied Petitioner's peremptory strikes. *See People v. Ruffin*, No. 243414, 2004 WL 1882643, at *2 (Mich. Ct. App. Aug. 24, 2004) (after remand). Petitioner alleges that he was unable to file a timely application for leave to appeal in the Michigan Supreme Court, and the Clerk of the Michigan Supreme Court has confirmed that no appeal was taken from Michigan Court of Appeals number 243414.

B.

On June 14, 2005, Petitioner filed a motion for relief from judgment, and on September 27, 2005, he filed an amended motion, which included Petitioner's thirteen habeas claims. The trial court determined that Petitioner's claims were without merit and that Petitioner had failed to establish ineffective assistance of trial or appellate counsel. The trial court concluded that Petitioner had failed to meet the stringent standard for obtaining relief from judgment, as set forth in Michigan Court Rule 6.508(D). The Michigan Court of Appeals denied leave to appeal the trial court's decision, citing Michigan Court Rule 6.508(D). *See People v. Ruffin*, No. 273091 (Mich. Ct. App. May 18, 2007). On September 24, 2007, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Ruffin*, 738 N.W.2d 735 (Mich. 2007) (table).

C.

Petitioner filed his habeas petition in this Court on December 11, 2007 [Dkt. #1]. His grounds for relief are:

I.      The Michigan state courts unreasonably applied clearly established United States Supreme Court precedent when they determined that

-3-

Mr. Ruffin was not denied his rights to due process where the trial court erred by giving constitutionally deficient jury instructions concerning reasonable doubt.

II.     The Michigan state courts unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights to effective assistance of counsel and due process where trial counsel failed to assert that the verdict rendered was against the great weight of evidence.

III.    The Michigan state courts made unreasonable determinations of fact or unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights to due process and confrontation where the trial judge who conducted the reconstruction hearing relied upon his own recollection.

IV.     The Michigan state courts unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights to effective assistance of counsel and due process where trial counsel failed to properly object to irrelevant and prejudicial evidence.

V.      The Michigan state courts unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights to effective assistance of counsel where the individual and cumulative effect of trial counsel's deficient performances rendered the result unreliable.

VI.     The Michigan state courts unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights to effective assistance of appellate counsel.

VII.    The Michigan state courts unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights to effective assistance where trial counsel subjected the challenged jurors to racial discrimination and then failed to move for cause when those challenges were denied.

VIII.   The Michigan Court of Appeals unreasonably applied clearly established United States Supreme Court precedent when they determined that Mr. Ruffin was not denied his rights where the trial court's ruling ended the jury selection while six peremptory

-4-

challenges remained unexercised or waived by the defense.

IX.    The Michigan Court of Appeals unreasonably applied clearly
       established United States Supreme Court precedent when they
       determined that Mr. Ruffin was not denied his rights to equal
       protection and due process where the trial court's erroneous ruling
       involved peremptory challenges by the defense.

X.     The Michigan Court of Appeals unreasonably applied clearly
       established United States Supreme Court precedent when it
       determined that Mr. Ruffin was not denied his rights to present a
       defense and due process where the trial court denied his motions to
       adjourn and for an expert witness to evaluate gunshot residue test
       results received from the prosecution the day of trial.

XI.    The Michigan Court of Appeals unreasonably applied clearly
       established United States Supreme Court precedent when it
       determined that Mr. Ruffin was not denied his rights to a fair and
       impartial jury and due process where the trial court failed to issue
       cautionary instructions on the outburst of the victim's brother.

XII.   The Michigan Court of Appeals unreasonably applied clearly
       established United States Supreme Court precedent when it
       determined that Mr. Ruffin was not denied his rights to due process
       where there was insufficient evidence to establish beyond a
       reasonable doubt either that Mr. Ruffin caused the death of the
       decedent or that it was a second degree murder.

XIII.  The Michigan Court of Appeals unreasonably applied clearly
       established United States Supreme Court precedent when it
       determined that Mr. Ruffin was not denied his right to due process
       where the trial court instructed the jurors to consider any hostility of
       the witnesses.

Petitioner raised claims eight through thirteen in the appeal of right, but not in a timely

application for leave to appeal in the Michigan Supreme Court. Petitioner raised the same claims

and his other habeas claims in his motion for relief from judgment and subsequent appeals.

Respondent argues that all of Petitioner's claims are barred from review by the doctrine of

procedural default because Petitioner did not present the claims to both state appellate courts on

-5-

direct appeal, and, when he attempted to rectify the problem by filing a motion for relief from judgment, all three state courts denied relief pursuant to Michigan Court Rule 6.508(D).[2]

　　　While it is true that the state appellate courts relied on Michigan Court Rule 6.508(D) when denying relief on collateral review, the United States Court of Appeals for the Sixth Circuit recently held that "[b]rief orders citing Michigan Court Rule 6.508(D) are not explained orders invoking a procedural bar." *Guilmette v. Howes*, 624 F.3d 286, 289 (6th Cir. 2010). Furthermore, the trial court specifically stated in its order denying Petitioner's motion for relief from judgment that Petitioner's claims were wholly without merit. Although the trial court also cited Michigan Court

---

[2] Michigan Court Rule 6.508(D) provides:

(D) Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion

(1) seeks relief from a judgment of conviction and sentence that still is subject to challenge on appeal pursuant to subchapter 7.200 or subchapter 7.300;

(2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;

(3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

(a) good cause for failure to raise such grounds on appeal or in the prior motion, and

(b) actual prejudice from the alleged irregularities that support the claim for relief.

　　　. . . .

The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

Rule 6.508(D)(3) in its decision, the court made no distinction between the claims that Petitioner previously raised in the Michigan Court of Appeals, for which Rule 6.508(D)(2) would apply, and claims that Petitioner was raising for the first time in his motion for relief from judgment, for which Rule 6.508(D)(3) would apply. The trial court concluded that Petitioner had not met his burden of establishing entitlement to relief under Rule 6.508(D)

"Rule 6.508(D) has both a procedural and a substantive component," and "citations to a defendant's failure to meet the burden of establishing entitlement to relief can refer to a defendant's failure to meet that burden on the merits." *Guilmette*, 624 F.3d at 291. This Court therefore is reluctant to conclude that Petitioner's claims are procedurally defaulted.

Even if some or all of Petitioner's claims are procedurally defaulted, procedural default is not a jurisdictional limitation. *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010). The Court therefore will proceed to address the merits of Petitioner's claims, using the following standard of review.

## II.

Habeas petitioners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court

-7-

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. And "where factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct." *Goodwin v. Johnson*, __ F.3d __, __, Nos. 06-3571 and 06-3572, 2011 WL 181468, at *5 (6th Cir. Jan. 21, 2001) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

"Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786 (2011). Section 2254(d)

> preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

-8-

fairminded disagreement.

*Id*. at 786-87.

III.

A.

Two of Petitioner's claims challenge the trial court's jury instructions. The first claim alleges that the trial court's jury instruction on reasonable doubt impermissibly shifted the burden of proof to Petitioner by suggesting that the jurors must find affirmative proof of Petitioner's innocence. Petitioner raised this claim for the first time in his motion for relief from judgment, which the trial court denied.

The thirteenth claim alleges that the trial court erred by instructing the jurors to consider evidence of a witness's hostility. Petitioner raised this claim in the appeal of right. The Michigan Court of Appeals declined to review the issue because Petitioner did not preserve the issue with an appropriate objection at trial and because he failed to establish that the instruction constituted plain error.

1.

The question on habeas review of jury instructions is whether the instructions violated some right guaranteed to the defendant by the Fourteenth Amendment or infected the entire trial to such an extent that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). An instruction

> "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction . . . , [courts] inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.

-9-

*Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Boyde v. California*, 494 U.S. 370, 380 (1990); *Cupp*, 414 U.S. at 147).

2.

The Supreme Court's decision in *Victor v. Nebraska*, 511 U.S. 1 (1994), is the starting point for the Court's discussion on reasonable doubt. In *Victor*, the Supreme Court stated that prosecutors "must prove beyond a reasonable doubt every element of a charged offense." *Id*. at 5 (citing *In re Winship*, 397 U.S. 358 (1970)). The Supreme Court went on to say that the Constitution does not require any particular words in advising a jury of the prosecutor's burden of proof, provided that "the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt." *Id*. The instructions, taken as a whole, must correctly convey the concept of reasonable doubt to the jury." *Id*. (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

The trial court read the following jury instruction on reasonable doubt to Petitioner's jury:

> [T]he standard of proof is proof beyond a reasonable doubt. Reasonable doubt, no matter how many times you define it, is a doubt that's based on reason and common sense.
>
> It's a fair, honest and reasonable doubt. The kind of a doubt that you must assign a reason for having.
>
> Now, a reasonable doubt is not a vain, or fictitious, or imaginary, or a hunch or a feeling, or a possibility of innocence.
>
> It's not a doubt that's based on sympathy or bias, or prejudice. But a fair, honest and reasonable doubt that may grow out of the evidence, the lack of evidence, or the unsatisfactory nature of the evidence.
>
> If you have an abiding conviction to a moral certainty that the People have met their burden, it is your duty to bring back a verdict of guilty.
>
> If you do not have an abiding conviction to a moral certainty, it is of course your duty to bring back a verdict of not guilty.

-10-

> Now, of course you decide the case on evidence.  You don't decide it on
> feelings, or hunches.  You decide it on the evidence.

(Tr. Apr. 26, 2002, at 6-7.)

Petitioner contends that use of the language "moral certainty" invited the jurors to return a

verdict based on something other than the evidence before them.  In *Cage v. Louisiana*, 498 U.S.

39 (1990) (per curiam), the Supreme Court found the following jury instruction on reasonable doubt

to be unconstitutional:

> It must be such doubt as would give rise to a grave uncertainty, raised in your mind
> by reasons of the unsatisfactory character of the evidence or lack thereof. A
> reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is
> a doubt that a reasonable man can seriously entertain. What is required is not an
> absolute or mathematical certainty, but a moral certainty."

*Id*. at 40.

The Supreme Court ruled that:

> the words "substantial" and "grave," as they are commonly understood, suggest a
> higher degree of doubt than is required for acquittal under the reasonable-doubt
> standard. When those statements are then considered with the reference to "moral
> certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror
> could have interpreted the instruction to allow a finding of guilt based on a degree
> of proof below that required by the Due Process Clause.

*Id.* at 41.

In *Victor*, however, the Supreme Court stated that "the moral certainty language cannot be

sequestered from its surroundings."  *Victor*, 511 U.S. at 16.  As explained in *Austin v. Bell*, 126 F.3d

843 (6th Cir. 1997), "use of the term 'moral certainty' does not, of itself, render a 'reasonable doubt'

instruction unconstitutional.  The phrase 'moral certainty' is constitutionally permissible where the

rest of the instruction 'lends content to the phrase,' and indicates the government's proper burden

of proof."  *Id*. at 847 (quoting *Victor*, 511 U.S. at 14.)

-11-

1:07-cv-15283-TLL-SDP   Doc # 11   Filed 03/04/11   Pg 12 of 35   Pg ID 1249

The reasonable doubt jury instruction in Petitioner's case informed the jury that its verdict had to be based on the evidence, the lack of evidence, or on the unsatisfactory nature of the evidence. Thus, there is not a reasonable likelihood that the jury would have understood the language "abiding conviction of a moral certainty" to be disassociated from the evidence in the case. The instructions as a whole were not unconstitutional because the language used did not suggest a standard of proof lower than due process requires. The language also did not allow a conviction on factors other than the evidence adduced at trial. The Court therefore concludes that the instruction on reasonable doubt correctly conveyed the concept of reasonable doubt.

3.

Petitioner alleges that the trial court deprived him of due process by instructing the jurors to consider the witnesses' hostility. Petitioner contends that the instruction tended to authorize the jurors to consider Lamont Glover's courtroom outburst during which he stated that Petitioner knew he killed Mr. Glover's brother.

The disputed instruction reads:

> You may consider whether or not any witness gave answers, when they were asked. Consider any hostility by the witness that was exhibited. Consider any bias that was shown by any witness.

> You may consider whether or not the witnesses gave answers which were responsible (sic) to the questions that were asked. You may consider any hostility. You may consider any reluctance of a witness to answer any questions.

(Tr. Apr. 26, 2002, at 12.)

These words were spoken in the context of the instruction on evaluating the credibility of witnesses. The court did not mention Lamont Glover's outburst when instructing on witnesses' hostility, and it is quite possible that the instruction was directed at Julia Turner, who was a reluctant

witness. The jury likely did not interpret the disputed instruction in such a way that it violated the Constitution. Therefore, Petitioner has no right to the writ of habeas corpus on the basis of the trial court's instruction on hostile witnesses.

## B.

The second, fourth, fifth, and seventh habeas claims allege ineffective assistance of trial counsel. Petitioner first raised these claims in his motion for relief from judgment.[3] The trial court denied the motion and stated that Petitioner had not establish ineffective assistance of trial counsel.

## 1.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To establish deficient performance, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

To demonstrate that counsel's performance prejudiced the defense, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citing *Strickland*, 466 U.S. at 693).

---

[3] Although Petitioner raised an ineffective-assistance-of-counsel claim on direct review, the basis for his claim was that defense counsel misled him into waiving his right to testify. He raised different underlying grounds for his ineffectiveness claim in his motion for relief from judgment.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Id*. at 788 (internal and end citations omitted).

2.

Petitioner alleges in habeas claim two that his trial attorney should have argued that the verdict was against the great weight of evidence.  Petitioner claims that the two main prosecution witnesses were unreliable and that the facts suggested an accidental shooting.  In a related claim (claim twelve), Petitioner alleges that the evidence at trial was insufficient to sustain the jury's verdict on the murder count.  Petitioner contends that there was insufficient evidence that he caused Mr. Smith's death.  The Michigan Court of Appeals reviewed Petitioner's sufficiency-of-the-evidence claim and concluded that the testimony of the prosecution's two main witnesses, Maia Williams and Julia Turner, was sufficient to establish that Petitioner was the shooter and that he acted with malice.

a.

The relevant question on review of a sufficiency-of-the-evidence claim is

> whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation omitted) (emphasis in original).

" 'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.' " *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

Courts must apply the Jackson standard "with explicit reference to the substantive elements

of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.  In Michigan, the elements of second-degree murder are "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v. Smith*,  731 N.W.2d 411, 414-15 (Mich. 2007) (citing *People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998)).  Malice is "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Goecke*, 579 N.W.2d at 878 (citing *People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980)).

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.  *People v. McCray*, 245 Mich. App. 631, 637, 630 N.W.2d 633 (2001).  "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v. Lemmon*, 456 Mich. 625, 647, 576 N.W.2d 129 (1998).  "[U]nless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination."  *Id.* at 645-646, 576 N.W.2d 129 (citation omitted).

*People v. Musser*, 673 N.W.2d 800, 803 (Mich. Ct. App. 2003).

b.

Maia Williams testified that, on the day of the shooting, she was living with Petitioner and Julia Turner on Harding Street in Detroit.  She was present in the kitchen when she heard a gunshot. She ran to the living room and saw Mr. Smith sitting at the dining room table with Petitioner, Julia, Julia's daughter, and two men.  Mr. Smith had been shot and was clutching his throat.  Petitioner had a gun in his hand, and his arm was stretched straight out in front of him.  After the shooting, Petitioner and Julia moved the body to the front door and instructed her to call the ambulance. Petitioner also told her to clean the blood off the dining room bench and to tell the police that the

-15-

victim had come to the front door, was holding his throat when they opened the door, and then fell. Petitioner threatened to do something to her if she told the truth. She lied to the police at first because she was frightened. She subsequently gave a second statement to the police and told them that Petitioner had shot Mr. Smith.

Julia Turner testified that she was living with Petitioner on the day of the shooting and that Mr. Smith had stopped by that day and talked with Petitioner. As she came from outside and entered the house, she heard a gunshot. The victim was lying at the front door when she came in and Petitioner was applying a towel to the victim's neck. Petitioner said it was a mistake, and he was imploring Mr. Smith not to die. Ms. Turner admitted at trial that she initially lied to the police about what had happened and later told the police that she thought Petitioner had shot Mr. Smith.

Police Officer Lisa Swatowski testified that she responded to the crime scene and saw the victim lying on his back with his head near the opening of the living room. Petitioner informed her that he had heard someone pounding at the door and when he opened the door, he saw Mr. Smith, who was holding his neck and bleeding. Petitioner had said that Mr. Smith fell inside the house. Officer Swatowski, however, found no blood at the front door and no evidence to support Petitioner's story that Mr. Smith was bleeding when he walked up to the door.

A pathologist testified that Mr. Smith died from a single gunshot wound to the chest and that the manner of death was homicide. Forensic chemist William Steiner testified that he detected gunshot residue on Petitioner, Julia Turner, and Maia Williams.

c.

A rational trier of fact could have concluded from the evidence, taken in the light most favorable to the prosecution, that Petitioner shot and killed Mr. Smith without lawful justification

-16-

or excuse.  Circumstantial evidence that he fired a gun at a person demonstrated malice, that is, an intent to kill, to do great bodily harm, or, at a minimum, wanton and willful disregard of the likelihood that the natural tendency of his behavior would cause great bodily harm.  As aptly explained by the Michigan Court of Appeals,

> [a]lthough the testimony indicated that defendant and the decedent had an amicable relationship, it also established that defendant fired a shot in Smith's direction.  One witness testified that defendant and Smith were exchanging profanity, but not arguing, and that defendant reached over and said, "what did you say [expletive deleted]," and was "like showing [the gun] to him, and the gun went off."  The jury could reasonably infer that defendant fired the gun intentionally.  Evidence that the shooting occurred at close range, that Smith was seated, that the decedent was shot in the chest, and that defendant owned and was familiar with guns also supports an inference that defendant intended to shoot Smith.  Also, malice may be inferred from the use of a dangerous weapon.  *People v. Carines*, 460 Mich. 750, 759 (1999).

*Ruffin*, 2004 WL 435417, at *5.

Petitioner claims that there was evidence of an accidental firing, but the only evidence of that was Ms. Turner's testimony that Petitioner had said it was a mistake and her testimony that Petitioner had tried to shoot past Smith and scare him.  The prosecutor was not required to rule out every hypothesis except that of guilty beyond a reasonable doubt, and the jury was free to reject the accidental-shooting theory.  A reviewing court, moreover, must defer to the fact finder's resolution of conflicting inferences.  *Jackson*, 443 U.S. at 326.

The testimony at trial was not deprived of all probative value and it did not contradict indisputable physical facts or defy physical realities.  Therefore, defense counsel was not ineffective for failing to move for a new trial on the ground that the jury's verdict was against the great weight of the evidence.  And the state appellate court's conclusion – that the evidence was sufficient to support Petitioner's murder conviction – was not contrary to, or an unreasonable application of, *Jackson*.

-17-

3.

Petitioner alleges next that his trial attorney failed to object adequately to irrelevant and prejudicial evidence.  The disputed evidence was Petitioner's confinement in jail, his gold medallion, which was shaped like a gun, and various live cartridges, which were found in his home.

a.

Petitioner's prior incarceration came to light when the victim's brother, Lamont Glover, testified that Petitioner and the victim met in jail.  (Tr. Apr. 24, 2002, at 64.)  Although defense counsel did not request a cautionary jury instruction, he did object to the testimony, and the trial court sustained the objection as a non-responsive answer to the prosecutor's question about whether the victim considered Petitioner to be like a nephew to him.  (Tr. Apr. 24, 2002, at 64-65.)  No further mention was made of Petitioner's time in jail. The Court therefore concludes that defense counsel's failure to request a cautionary jury instruction did not amount to deficient performance. Even if counsel's performance was deficient, it likely was not prejudicial because, for purposes of the felon-in-possession charge, the parties stipulated that Petitioner had a prior felony conviction. (Apr. 25, 2002, at 100.)

b.

The prosecutor asked Police Officer Lisa Swatowski whether she had noticed anything unusual about Petitioner's appearance when she arrived at the crime scene.  Officer Swatowski responded that Petitioner had been wearing a large gold medallion in the shape of a gun and that it seemed kind of odd at the time.  Petitioner claims that his attorney should have requested a curative jury instruction when Officer Swatowski testified about the gold medallion.

Although defense counsel did not request a curative instruction, he did object to the

testimony three times.  The trial court ruled that Officer Swatowski could testify about what she saw, but that she could not draw any conclusions from her observations.  (Tr. Apr. 24, 2002, at 182-84.) In light of defense counsel's repeated objections to the evidence and the restrictions placed on Officer Swatowski's testimony, defense counsel was not ineffective was failing to request a cautionary jury instruction.

### c.

Petitioner's final claim about defense counsel's failure to object adequately at trial concerns a police officer's testimony that she recovered two live rounds and a spent slug from Petitioner's home.  (*Id.* at 148-51.)  Petitioner contends that his trial attorney should have objected to the officer's testimony and declined to stipulate that various live cartridges were recovered from his home.

Even if the jury assumed from the police officer's testimony that Petitioner possessed guns and ammunition, there was substantial evidence that Petitioner fired a gun at Mr. Smith, that Mr. Smith died from a through-and-through gunshot wound, that Petitioner tried to cover up the shooting, and that Petitioner was not eligible to carry a firearm.  Given the substantial amount of evidence against Petitioner, defense counsel's allegedly deficient performance in failing to object to testimony regarding ammunition did not prejudice the defense.

### 4.

Petitioner asserts that his trial attorney attempted to use peremptory challenges to excuse certain jurors on the basis of their race and that the challenged jurors likely were humiliated by being challenged and therefore biased against him.  He claims that his attorney should have moved to eliminate the jurors for "cause" after his peremptory challenges were denied.

It is unlikely that defense counsel's failure to attempt to excuse the challenged jurors for cause prejudiced Petitioner, because the trial court explained to the prospective jurors that the attorneys' questions were meant to help the attorneys determine whether the jurors could be fair and impartial and decide the case on the evidence. (Tr. Apr. 23, 2002, at 9-10.) And at the post-judgment reconstruction hearing, the trial court stated that there was nothing about any of the jurors whom defense counsel attempted to excuse through peremptory challenges that would have shown any bias or predisposition to decide the case on anything other than the evidence. (Tr. Apr. 2, 2004, at 32.) Thus, there is no reason to believe that the jurors whom defense counsel attempted to excuse were biased against him. The Court therefore concludes that, even if defense counsel's tactics were improper, the deficiency did not prejudice the defense.

### 5.

Petitioner's final claim about his trial attorney is that the cumulative effect of counsel's errors rendered the result of the trial unreliable. This claim lacks merit because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Therefore, it cannot be said that the state court's decision on Petitioner's claim was contrary to Supreme Court precedent. Constitutional errors that would not individually support habeas relief simply cannot be cumulated to support habeas relief. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

### C.

The third, eighth, and ninth habeas claims pertain to *voir dire* and the trial court's denial of defense counsel's peremptory challenges against three Caucasian venirepersons. Petitioner, who is an African American, asserts that the trial court deprived him of his constitutional rights to equal

protection and due process by not following the procedures outlined in *Batson v. Kentucky*, 476 U.S. 79 (1986).  Petitioner further alleges that the trial court improperly terminated jury selection while he still had six peremptory challenges to exercise and that the court improperly relied on its own recollection at the reconstruction hearing in the trial court.

1.

"Under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986), and later decisions building upon *Batson*, parties are constitutionally prohibited from exercising peremptory challenges to exclude jurors on the basis of race, ethnicity, or sex."  *Rivera v. Illinois*, __ U.S. __, __, 129 S. Ct. 1446, 1451 (2009).

> *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:
>
> > " 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.' "

*Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (alterations in original) (citations omitted).

"Defense attorneys, like prosecutors, may not challenge potential jurors because of their race." *United States v. Angel*, 355 F.3d 462, 471 (6th Cir. 2004) (citing *Georgia v. McCollum*, 505 U.S. 42, 59 (1992)).  Therefore, "if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." *McCollum*, 505 U.S. at 59.

> Although the burden of *production* switches after step one and again after step two, "the ultimate burden of *persuasion* regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (emphasis added); *see also McCurdy*

-21-

> *v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001). And the trial court may
> not short circuit the process by consolidating any two of the steps. *See Purkett*, 514
> U.S. at 768, 115 S. Ct. 1769; *United States v. McFerron*, 163 F.3d 952, 955 (6th Cir.
> 1998).

*United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008) (emphasis in original).

A trial court's decision with respect to peremptory challenges is not subject to harmless error review. *United States v. Harris*, 192 F.3d 580, 588 (6th Cir. 1999). "[A]ny racial discrimination in jury selection constitutes structural error that requires automatic reversal." *Angel*, 355 F.3d at 471.

2.

The record indicates that, after defense counsel excused four prospective jurors, there was a discussion off the record between the trial court and the attorneys. The trial court then denied defense counsel's last peremptory challenge. Defense counsel attempted to excuse two more venirepersons, but the trial court also denied those peremptory challenges. Another bench conference was held off the record. Defense counsel then excused an additional venireperson and also attempted to use peremptory challenges on two of the jurors whom the court had already said he could not excuse. Defense counsel objected to the trial court's denial of his peremptory challenges and asked to make a record. The trial court stated that defense counsel would have an opportunity to make a record. However, before a record could be made, the court declared that it had a jury. The trial court stated that defense counsel had not accepted the court's ruling and that defense counsel had a right to excuse jurors, but not for the reasons he gave. *Voir dire* then came to a conclusion. (Tr. Apr. 24, 2002, at 39-43.)

After the jury left the courtroom, the trial court offered defense counsel an opportunity to state on the record what he had told the court off the record. Defense counsel responded that he had

-22-

informed the court that less than thirty per cent of the first set of jurors seated in the courtroom were African Americans.  Counsel denied selecting jurors on the basis of race, and he pointed out that his first peremptory challenge had been directed at a female African American.  The trial court, however, noted that the African American juror was a police officer whose husband was also a police officer.  The trial court stated that there was a valid reason for excusing her, but that the next seven or eight people were all Caucasians and that it had denied the peremptory challenges because it was obvious defense counsel wanted a racial mix or a jury based on percentages.  Although defense counsel replied that there were valid reasons for excusing the jurors, the trial court did not allow defense counsel to explain his reasons.  (*Id.* at 44-48.)

Petitioner alleged on direct appeal that reversal was required because the trial court violated *Batson* by denying three of his peremptory challenges.  The Michigan Court of Appeals correctly observed that the trial court had collapsed the three-step process outlined in *Batson* into one step. The Court of Appeals consequently remanded the case for an evidentiary hearing and for a determination as to whether a record could be reconstructed to enable the trial court to properly apply *Batson's* three-step analysis.

A reconstruction hearing was held on April 2, 2004.  The parties agreed at the hearing that the sequence of peremptory challenges by defense counsel had been:  one African American female police officer, five Caucasian people (two women and one man), three additional Caucasian jurors all at one time, and one African American man.  (Tr. Apr. 2, 2004, at 4-5.)  Petitioner's trial attorney testified that he did not remember why he had challenged the venirepersons, but he denied that it was for racial reasons.  He admitted, however, that he may have informed the trial court during trial that his client was entitled to a racially balanced jury.  (*Id.* 9-12.)

-23-

Neither trial counsel, nor the trial prosecutor, could recall what was said at the bench conferences during trial, and the trial prosecutor stated that she did not recall defense counsel's reasons for exercising his challenges. (*Id*. at 13, 20, and 24.)  The prosecutor handling the hearing then asked the trial court whether it had any recollection of what defense counsel's reasons were for exercising his peremptory challenges.  The Court responded that it did recall what happened and that the conferences were about the jurors being excused.  The court explained that:

> [A]fter the challenge was made I called [them] up to explain that . . . you can't do this. You cannot excuse jurors for racial reasons.
>
> * * *
>
> Now, in this case I called him up and we discussed it and I said, Mr. Harris you cannot do that and he stated, "my client is entitled to a racially balanced jury." Those are the words and the court could see it.  It was so obvious that people were being excused, that there was no logical reason that I could see that the juror was challenged except in an attempt to get as many black jurors on the jur[y] as possible. My understanding of the law is that the prosecutor can't do that, the defense attorney can't do that.  And that's why the court disallowed the challenges.
>
> * * *
>
> And his words again, were, "My client is entitled to a racially balanced jury." And I think that shows racial reasons for excusing jurors and that's why I disallowed it.

(*Id*. at 25-28.)

When the prosecutor asked whether the trial court could recall any other reason that defense counsel gave, the trial court responded, "None.  It was obvious, that's why I made the ruling.  It was obvious, you know, no subtlety about it.  But that's what happened."  (*Id*. at 27-28.)

Petitioner's appellate attorney pointed out at the hearing that, even though trial counsel could not remember two years after trial what his reasons had been for exercising peremptory challenges, he did state during *voir dire* that he had reasons.  The trial court dismissed this argument, saying:

-24-

He did have a reason . . . [H]e expressed what the reason was, that's on the record already.  He had a reason he wanted to have a racially balanced jury.

. . . .

[W]hen there's a pattern that's obvious to me, I can see what the reasons were, so that's why we had the side bar and that's where he practically admitted that that was what he was doing.

Now, we can speculate on all kinds of things but there's nothing about any of those jurors that would have shown any bias or predisposition to decide this case on anything other than the evidence that they heard.

. . . .

Defense counsel came up here and almost just about admitted right here in court that his reason was to get a balanced jury . . . .

I ruled because I saw what was going on and I do remember.  Maybe [the trial prosecutor and defense counsel] don't remember specifically, but I did it because there was obvious racial reasons involved in selecting those things and I thought the Court should see it and make a ruling on it and we have a record now.  You're expressing a theory, I was here, I know what happened.

(*Id*. at 31-34.)

Following the hearing, the Michigan Court of Appeals affirmed Petitioner's convictions. The Court of Appeals determined that Petitioner had established a *prima facie* case of purposeful discrimination, that Petitioner failed to state a race-neutral reason for the strike, and that the trial court properly denied Petitioner's peremptory strikes.

3.

a.

As noted, the first step in a *Batson* analysis is determining whether a *prima facie* case has been established.  This requires showing that a party used peremptory challenges to exclude venirepersons from the jury on account of their race.  *Batson*, 476 U.S. at 96.  A defendant can

-25-

establish a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94. A pattern of strikes against a racial group within the venire can give rise to an inference of discrimination. *Id*. at 96-97.

The Michigan Court of Appeals analyzed the *prima facie* case as follows:

> The trial court expressed on remand that it found an established pattern of strikes made in relation to the racial identities of other members of the jury pool. The record reflects that before the trial court denied defendant's peremptory challenges, defendant had exercised six peremptory challenges, which he acknowledges were used to excuse five Caucasian and one African-American venirepersons. Because the excused African-American venireperson was a police officer who was both married and related to other police officers, defendant's use of a peremptory strike against that individual would not necessarily negate a suspicion that defendant's use of peremptory challenges to remove Caucasian jurors was racially motivated, as the trial court determined.

*People v. Ruffin*, 2004 WL 1882643, at *1. This Court agrees, for the reasons given by the Michigan Court of Appeals, that a prima facie case of purposeful discrimination was established.

b.

The second step in a *Batson* analysis is determining whether there was a race-neutral basis for striking the jurors in question. The trial court and the Michigan Court of Appeals concluded that there were no race-neutral reasons for eliminating Caucasian jurors. Although defense counsel was prevented from making a record of race-neutral reasons at trial, he was given that opportunity at the reconstruction hearing. He testified that he had reviewed his trial notes before the hearing, was unable to find any notations regarding his challenges, and could not recall the reasons he had for using his peremptory challenges.

Although defense counsel denied excusing prospective jurors for racial reasons, "a mere denial of an impermissible motive and assertion of good faith [do] not satisfy the [party's] burden in responding to a prima facie case of purposeful discrimination." *United States v. Hill*, 146 F.3d

-26-

337, 341 (6th Cir. 1998) (citing *Purkett*, 514 U.S. at 769). Nor does the failure to recall the reason

for using a peremptory challenge to strike a juror satisfy the *Batson* requirement to provide a neutral

explanation related to the particular case to be tried. *Harrison v. Ryan*, 909 F.2d 84, 87 (3d Cir.

1990). Petitioner therefore has failed to satisfy step two of the *Batson* analysis by showing any race-

neutral reasons for attempting to eliminate three Caucasian jurors.

c.

The third step of the *Batson* analysis requires determining whether the defendant has shown

purposeful discrimination. The trial court concluded that defense counsel's pattern of strikes was

purposeful discrimination, and the Michigan Court of Appeals determined that the trial court did not

abuse its discretion, nor improperly deny Petitioner's peremptory strikes.

"[T]he trial court's decision on the ultimate question of discriminatory intent represents a

finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York*, 500 U.S.

352, 364 (1991). Because defense counsel failed to allege any race-neutral reasons for his strikes,

this Court finds that the trial court's factual finding – that there was intentional discrimination – was

based on a reasonable determination of the facts. The trial court's ultimate conclusion, and the state

appellate court's affirmance of that finding were reasonable applications of *Batson*. *Batson*'s

requirement was satisfied because Petitioner was "tried by a jury whose members [were] selected

pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85-86.

4.

Petitioner contends that the trial court erred by relying on its own recollection at the

reconstruction hearing. He claims that the court's conduct gave the appearance of bias and deprived

him of his right of confrontation. The Michigan Court of Appeals, however, specifically ordered

-27-

an evidentiary hearing for the purpose of reconstructing the record, if possible, and the record indicates that it was the prosecutor who asked the trial court whether it could recall what was said at the bench conferences during *voir dire*.  The court displayed no bias against Petitioner, and Petitioner's right of confrontation was not violated at the hearing, because his appellate attorney was free to question the trial court after the court explained what it remembered.  Where a habeas petitioner alleges only that the trial court erred in navigating the procedural steps needed to resolve a *Batson* claim, as distinct from a claim that the trial court permitted a party to engage in racially discriminatory tactics during *voir dire*, "there is no good reason why a federal habeas court should apply an automatic reversal rule . . . ."  *Reyes v. Greiner*, 340 F. Supp. 2d 245, 277 (E.D. N.Y. 2004).  The Court therefore concludes that Petitioner is not entitled to habeas corpus relief on the basis that the trial court relied on its own recollection at the reconstruction hearing.

5.

Petitioner alleges that the trial court deprived him of his right to exercise all his peremptory challenges by terminating *voir dire* while he still had six peremptory challenges left.  There is no constitutional right to peremptory challenges, *Rivera v. Illinois*, __ U.S. __, __, 129 S. Ct. 1446, 1453 (2009), and the alleged violation of Michigan Court Rule 2.511(E) is not a basis for habeas relief.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (stating that "federal habeas relief does not lie for errors of state law").

It is true that peremptory challenges are " 'one of the most important of the rights secured to the accused,' *Pointer v. United States*, 151 U.S. 396, 408, 14 S. Ct. 410, 414, 28 L.Ed.208 [(1894 )]," and "[t]he denial or impairment of the right is reversible error without a showing of prejudice," *Swain v. Alabama*, 380 U.S. 202, 219 (1965), *reversed in part on other grounds by Batson*, 476 U.S.

at 100 n.25.  Nevertheless, in this case, the Michigan Court of Appeals determined that Petitioner waived his claim about a premature declaration of jury by "indicat[ing] that the only remaining peremptory challenges he wanted to exercise were those that the court had already rejected." *Ruffin*, 2004 WL 435417, at *4.  The Court of Appeals concluded that "[t]he trial court properly interpreted defense counsel's statements as a waiver of any remaining peremptory challenges, apart from those that the court already denied." *Id*.

The record supports the state court's findings.  Defense counsel attempted to exercise peremptory challenges on two venirepersons, whom the trial court had already said he could not excuse.  When the trial court asked counsel whether the court should declare a jury or whether defense counsel had any challenges he wished to make, counsel stated that he did not agree with the manner in which the court was proceeding and that the court had denied his challenges.  He gave no indication that wanted to excuse any more jurors other than the ones he had already attempted to excuse.  (Tr. Apr. 24, 2002, at 42-43.)  The state court therefore properly concluded that Petitioner waived his right to exercise any remaining peremptory challenges.  Petitioner has no right to relief on the basis of the allegedly premature declaration of a jury.

### D.

The tenth claim alleges that the trial court deprived Petitioner of his right to present a defense by (1) denying his motion for appointment of an expert witness to evaluate the results of gunshot residue tests and (2) denying his motion to adjourn the trial to acquire an expert witness.  Petitioner contends that an expert witness was necessary to attack the credibility of Maia Williams and Julia Turner, who had gunshot residue on their bodies after the shooting.

The Michigan Court of Appeals reviewed this claim on direct appeal and concluded that the

-29-

trial court did not abuse its discretion in denying defense counsel's request for appointment of an expert. According to the Court of Appeals, the mere assertion that an expert might have provided assistance to the defense did not demonstrate that a defendant cannot safely proceed to trial without expert assistance.

1.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (internal citation omitted). The right to present evidence is not absolute, however. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).

> While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . . [T]he Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues.

*Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quotation marks and citations omitted).

As for appointment of expert witnesses, the Supreme Court has held that defendants in criminal cases have a constitutional right to the assistance of a psychiatrist once he "has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985). The Supreme Court has not clearly established a constitutional right to the appointment of other expert witnesses, *Sanchez v. Hedgpeth*, 706 F. Supp. 2d 963, 988 (C.D. Cal. 2010), and

> "[a] trial court's decision to grant or deny a continuance is a matter of discretion. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *Bennett v. Scroggy*, 793 F.2d 772, 774-75 (6th Cir.1986). As [the Sixth

-30-

Circuit] held in *Powell v. Collins*, "[a]bsent proof of a violation of a specific constitutional protection, a habeas petitioner must show that a trial error was so egregious as to deprive him of a fundamentally fair adjudication, thus violating constitutional principles of due process." 332 F.3d 376, 396 (6th Cir.2003) (citing *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988)). The denial of a continuance constitutes a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'. . . ." *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (quoting *Ungar*, 376 U.S. at 589, 84 S.Ct. 841).

*Landrum v. Mitchell*, 625 F.3d 905, 927 (6th Cir. 2010).

2.

Before *voir dire* commenced on the first day of Petitioner's trial, defense counsel informed the trial court that he had received the result of gunshot residue tests that morning. The trial court responded that defense counsel would have the rest of the day and night to review the tests because they would be merely selecting a jury that day. (Tr. Apr. 23, 2002, at 3-4.)

On the following morning, defense counsel informed the court that he would need two or three more days to deal with the gunshot residue evidence because the evidence pertained to key witnesses. Then he asked the trial court to appoint a firearms expert. The trial court declined to delay the trial or to appoint an expert defense witness. The court stated that defense counsel could produce any witness he wanted at his own expense, but that the trial would proceed. (Tr. Apr. 24, 2002, at 4-6.)

The trial court had discretionary authority not to appoint an expert witness, and Petitioner has failed to show that he was prejudiced by the lack of an expert witness. The State's forensic chemist testified that he detected gunshot residue on Petitioner's right and left hands, but also on Julia Turner's hands, forehead, and face and on Maia Williams' left hand, forehead, and face. He explained that having gunshot residue on one's body does not mean the person fired a gun and that

-31-

gunshot residue can be transferred by pushing or pulling a person who was shot.  (*Id.* at 195, 198.)

On cross-examination by defense counsel, the forensic chemist admitted that it was possible Julia Turner had fired the gun and that the gunshot residue found on her was not necessarily the result of moving a body.  (*Id.* at 202-03.)  The chemist further testified that Maia Williams could have acquired gunshot residue on her hands and forehead by firing a gun.  (*Id.* at 203.)  The chemist also testified that one could acquire gunshot residue on the web of one's hands if one were simply standing near someone who fired a gun.  (*Id.* at 207.)

The forensic chemist's testimony was non technical and readily understandable, and defense counsel was able to elicit from him testimony suggesting that Julia Turner or Maia Williams could have been the shooter.  Therefore, the trial court's refusal to appoint an expert defense witness or to postpone the trial did not deprive Petitioner of a substantial defense.

E.

The eleventh habeas claim alleges that the trial court deprived Petitioner of his right to a fair and impartial jury and due process of law by failing to issue cautionary jury instructions following an outburst by the victim's brother during trial.  The Michigan Court of Appeals determined that the trial court reasonably concluded that giving the instruction would have emphasized the outburst and that the court's charge to the jury to consider only the admissible evidence conveyed the same basic message as a cautionary instruction would have conveyed.

> The Sixth Amendment guarantees the criminal defendant a right to a fair trial by an impartial jury. *Williams v. Bagley*, 380 F.3d 932, 943 (6th Cir. 2004) (citing *Morgan v. Illinois*, 504 U.S. 719, 726-27, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). Certain disruptions during trial may affect the impartiality of the jury.   In such cases, the inquiry is "whether there has been an impingement upon the right of [the defendant] to be tried before a fair and impartial jury." *United States v. Black*, 369 F.3d 1171, 1177 (10th Cir. 2004) (internal quotations and citation omitted).

-32-

*Stewart v. Wolfenbarger*, 468 F.3d 338, 349 (6th Cir. 2006). "Courtroom outbursts and disruptions . . . , although regrettable and deplorable, cannot be seized upon in and of themselves as justifications for retrials." *United States v. Bamberger*, 456 F.2d 1119, 1128 (3d Cir. 1972).

While seated in the courtroom, the victim's brother, Lamont Glover, apparently stated, "He knows he killed my brother." In the jury's absence, defense counsel asked the trial court to read an appropriate instruction to the jury. The trial court denied the request on the grounds that the jurors were middle-aged, intelligent people who understood that, when people are killed, relatives become emotional. The court noted that courtroom deputies had removed Mr. Glover from the courtroom and that a jury instruction regarding the outburst would merely emphasize it. The court stated that it did not believe a single person had been influenced by the outburst. (Tr. Apr. 24, 2002, at 132-33.)

It might have been preferable for the trial court to question the jurors to determine whether the incident had affected their ability to be fair and impartial and to advise the jurors that Mr. Glover's comments were not evidence. *Cf. Stewart*, 468 F.3d at 350. But the trial court did explain to the jurors what was and was not evidence at the conclusion of the case. (Tr. Apr. 26, 2002, at 7-10.) The court specifically stated that only the testimony and exhibits were evidence (*id*. at 7), and, as the Michigan Court of Appeals pointed out, Mr. Glover had already testified before his outburst in the courtroom. Thus, "there was little danger that the jury would improperly treat the substance of the exclamation as evidence." *Ruffin*, 2004 WL 435417, at *5. This Court concludes that the lack of an immediate cautionary jury instruction did not deprive Petitioner of a fair trial, particularly where the evidence against him was substantial.

F.

Petitioner alleges that his appellate attorney was ineffective for not raising all his claims in the appeal of right. Petitioner first raised his claim about appellate counsel in his motion for relief from judgment. The trial court determined in its order denying the motion that Petitioner's claims were wholly without merit and that Petitioner had not established ineffective assistance of appellate counsel.

Petitioner was not entitled to compel his appointed attorney to raise all nonfrivolous claims on appeal if counsel, as a matter of professional judgment, elected not to raise the claims. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact, the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of effective appellate advocacy." *O'Sullivan v. Boerckel*, 526 U.S. 838, 858 (1999) (quotation marks and end citations omitted).

Furthermore, the Court has found no merit in the claims that counsel did not raise on direct appeal. Those claims include the challenges to the jury instruction on reasonable doubt, the weight of the evidence, and defense counsel's errors and admissions. Appellate counsel appears to have made an objectively reasonable decision not to raise those claims, and there is not a reasonable probability that, but for appellate counsel's failure to raise the claims, Petitioner would have prevailed on appeal. The Court therefore concludes that appellate counsel was not constitutionally ineffective.

IV.

The state courts' adjudications of Petitioner's claims did not result in decisions that were contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or

an unreasonable determination of the facts.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [Dkt. #1] is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **GRANTED** in part because jurists of reason could debate the Court's assessment of Petitioner's claim that the *Batson* challenges were wrongly sustained. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, the Court **GRANTS** a certificate of appealability on habeas claims three, eight, and nine. The Court declines to grant a certificate of appealability on Petitioner's remaining claims because those claims do not deserve encouragement to proceed further. Petitioner nevertheless may proceed *in forma pauperis* on appeal if he chooses to appeal this decision.

                                        s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

Dated:  March 4, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 3, 2011

                          s/Tracy A. Jacobs
                          TRACY A. JACOBS

---

-35-